THE STATE *v.* THE TRUSTEES OF THE VINCENNES UNIVERSITY.

The act of congress of *March* 26, 1804, entitled " an act making provision for the disposal of the public lands in the *Indiana* territory, and for other purposes," conferred no rights on the trustees of the *Vincennes University* to the township of land, reserved by that act for the use of a seminary of learning, and which was subsequently located in *Gibson* county. They were not then in existence as a corporation.

It was the intention of congress, in reserving these lands, to afterwards appropriate them to the use of such seminary as it should designate.

The act of the territorial legislature of 1806, granting the use of said lands to said university, was nugatory, as no such power was conferred on the legislature by congress.

Congress, in 1816, granted said township, and one additional township, to the state.

ERROR to the *Marion* Circuit Court.

SMITH, J.—By an act of the general assembly, passed in 1846, the trustees of the *Vincennes University* were authorized to file a bill in chancery, in the nature of an action of disseizin, for the purpose of trying their right to the township of land, in *Gibson* county, called the seminary township. A bill was accordingly filed in the *Marion* Circuit Court, claiming that said trustees were entitled to the use of said lands, of which they had been wrongfully dispossessed by the state. The cause was heard upon the bill, answer, and depositions, and the Circuit Court rendered a decree in favor of the complainants, requiring the state to pay to them 30,099 dollars and 96 cents, being the proceeds of a portion of the lands in said township, sold by authority of several acts of the legislature, which proceeds were paid into the state treasury for the use of the *Indiana University*, a state institution of learn-

CASES IN THE SUPREME COURT

Nov. Term,
1850.

THE STATE
v.
THE TRUS-
TEES, &c.

ing, located at *Bloomington*. From this decree, the present writ of error was prosecuted.

The material facts, upon which the right of the complainants to have a. decree to this effect must depend, may be stated as follow :

An act of congress of *March* 26, 1804, (U. S. Stat. at Large, vol. 2, p. 277,) entitled " an act making provision for the disposal of the public lands in the *Indiana* territory, and for other purposes," established three land districts, namely, the districts of *Detroit, Kaskaskia,* and *Vincennes.* It directed the survey and sale of the lands in those districts to which the government then had title, with certain exceptions. The fifth section enacts : "that all the lands aforesaid, not excepted by virtue of the preceding section" (referring to exceptions made of lands claimed under *French* and *English* grants,) " shall, with the exception of the section numbered sixteen, which shall be reserved in each township, for the support of schools within the same, with the exception also of an entire township in each of the three above described tracts of country or districts, to be located by the secretary of the treasury, for the use of a seminary of learning, and with the exception also of the salt springs and lands reserved for the use of the same, as hereinafter directed, be offered for sale to the highest bidder," &c.

Afterwards, on the 10th of *October*, 1806, *Albert Gallatin*, then secretary of the treasury, located the township number two south, range eleven west, now in *Gibson* county, for the use of a seminary of learning, under the above mentioned act. This location was made by a letter addressed to the register of the land office at *Vincennes*, as follows :

" SIR :—In conformity with the provisions of the fifth section of the act making provision for the disposal of the public land in the *Indiana* territory, and for other purposes, I do hereby locate, for the use of a seminary of learning, the township No. two, south of the base line, in the eleventh range west, of the *Vincennes* district, being the same which is recommended for that purpose in your and

the receiver's joint letter, of the 12th ult.   You will please enter the location accordingly, in your book of entries, in order that the same may be matter of record."

In 1806, an act was passed by the legislature of the *Indiana* territory, incorporating an university.   The second section of this act is as follows :

" And whereas, congress has appropriated a township of land, of 23,040 acres, for the use and support of the university, or a public school, in the district of *Vincennes;* and whereas, the township is now located, and the boundaries designated; be it therefore enacted, that the trustees, in their corporate capacity, or a majority of them, be, and they are hereafter authorized to sell, transfer, convey, and dispose of any quantity, not exceeding 4000 acres, of the said land, for the purpose of putting into immediate operation, the said institution or university, and to lease or rent the remaining part of the said township, to the best advantage, for the use of the said public school or university."

By virtue of the authority given by this act, the trustees of the *Vincennes University* sold about 4000 acres of said land.

On the 19th of *April*, 1816, the act to provide for the admission of the state of *Indiana* into the union, was passed by congress.   It contained, among others, the following propositions, which, when accepted by the convention assembled to form a state constitution, were to be obligatory on the *United States*, and they were so accepted:

That the section numbered sixteen in every township, should be granted to the inhabitants of such township, for the use of schools;

That all salt springs within the territory, and the land reserved for the use of the same, should be granted to the state, for the use of the people of the state, to be used as the legislature of the state should direct;

" That one entire township, which shall be designated by the president of the *United States*, in addition to the one heretofore reserved for that purpose, shall be reserved for the use of a seminary of learning, and vested in the

Nov. Term,
1850.

THE STATE
v.
THE TRUS-
TEES, &c.

legislature of the said state, to be appropriated solely to the use of such seminary, by the said legislature."

On the 27th of *April*, 1816, an act was passed by congress which reads as follows:

*Be it enacted*, &c., " that the several persons who purchased lands in township numbered two south, of range eleven west, in the district of *Vincennes*, from the board of trustees of the *Vincennes University*, which was incorporated by an act of the legislature of the *Indiana* territory, entitled ' an act to incorporate an university in the *Indiana* territory,' passed the 29th of *November*, 1806, be, and they are hereby, confirmed in their titles in fee-simple respectively." U. S. Stat. at Large, vol. 6.—Private Laws, p. 171.

The act establishing a state seminary at *Bloomington* was passed on the 20th of *January*, 1820, by the general assembly. In this act the seminary township in *Gibson* county is not mentioned, but on the 22d of *January*, at the same session, a joint resolution was adopted appointing one *Jesse Emmerson* a superintendenl to rent the improved lands in that township, and directing him to account to the state for the proceeds.

On the 22d of *January*, 1822, an act was passed by the legislature of the state, entitled " an act to provide for the sale of the seminary township in *Gibson* county," &c. The first section of this act appoints commissioners to make sale of the land in that township. The fourth section requires the money to be paid into the state treasury " that it may be made a productive fund for the benefit of the state seminary." The seventh section is as follows:

" Whereas, it is stated to this general assembly that the former board of trustees of the *Vincennes University* sold certain quarter sections of the seminary township without making and executing deeds therefor, and that the said board has expired by the negligence of its members; for remedy whereof, the said commissioners, or a majority of them, shall, and they are, hereby authorized and directed to hear the claims, receive evidence, and decide on

the said sales and purchases; and when to make them it may seem just and right, to make and execute deed or deeds of conveyance to the purchaser or purchasers of any one or more quarter section or sections of land in the said seminary township, so purchased as aforesaid under the provisions of the act of the general assembly authorizing the said board of trustees to sell and dispose of part of the said seminary township of land."

On the 25th of *January*, 1827, another act was passed by the legislature of the state, appointing commissioners to make sale of the lands in both the *Gibson* and *Monroe* townships, and they were required to pay the proceeds to the state treasurer.

By virtue of these acts about 17,000 acres of the land in the *Gibson* township were sold by the commissioners, and the proceeds, with the interest thereon, amounting to the sum mentioned in the decree, were paid into the state treasury for the use of the *Indiana University*.

Accompanying the depositions there is a paper containing what are called "extracts and copies," taken from a book having on its first page the title, "Minutes and Proceedings of the Board of Trustees for *Vincennes University*, *Indiana* Territory." They were introduced for the purpose of showing the organization and continuance of the board of trustees, and that certain petitions were preferred by the board to congress with the view of obtaining authority to sell the lands remaining unsold in the *Gibson* township.

By these minutes it appears that the board was organized by the election of officers in *December*, 1806, and held meetings one or more times during almost every year from that period until *April*, 1824.

At the meeting of *November*, 1817, a petition appears to have been prepared and signed by the board, asking congress for authority to sell the remainder of the land in said township for the purpose of vesting the proceeds in stocks for the use of their institution. The petition states that the sum realized by the sale of 4,000 acres had been expended in the erection of a building suitable for a public school, but that having no other means than the prices

Nov. Term, 1850.

THE STATE
v.
THE TRUS-
TEES, &c.

of tuition for the support of teachers, they had been able to open a grammar school only. The petition also stated that but few leases had been taken, and believing, from the newness of the country, &c., the arrangement likely to prove unproductive, they had for the present abandoned the measure.

It seems that this petition was referred to a committee of the senate of the *United States*, who reported unfavorably to the object of the petitioners, on the ground that it was inexpedient to authorize the land to be sold at that time. The report does not go into any examination of the rights of the petitioners under the laws passed upon the subject. See report of Mr. *Morrow* in the American State Papers, Public Lands, vol. 3, p. 266.

At a meeting of the board of trustees in *December*, 1818, a second petition for authority to sell said lands was prepared and ordered to be forwarded to the representatives of this state in congress, but with what result does not appear.

A second extract from the book of the trustees, shows, that in *June*, 1838, pursuant to a call published in the *Vincennes Gazette*, the trustees met and proceeded to organize the board by the election of officers. At this meeting, a standing committee of three was appointed to require from the trustees of the borough a statement of the situation of the common fund and contemplated expenditure thereof; to procure, if possible, the old books of the board; to prepare and report all necessary by-laws; and to act generally as a finance committee.

In the year 1844, the said trustees caused actions of ejectment or disseizin to be instituted in the *Gibson* Circuit Court, against the occupants of said lands sold by the state, which actions were dismissed after the passage of the act authorizing them to sue the state, that act making provision that the state should be considered as standing in the place of those occupants.

The above statement, it is believed, contains all the facts shown by the bill, answer, and depositions, with the various acts referred to, which can have any bearing upon

the decision of the questions involved in this contro- Nov. Term, 1850.
versy.

The first question which presents itself is, whether the The State v. The Trustees, &c.
act of congress of 1804, and the act of the territorial
legislature in 1806, conferred any right to the land in con-
troversy on the complainants, for upon these acts their
whole claim rests.

The purpose of the act of 1804 was to provide for the.
sale of the public lands in the districts of *Vincennes*, *De-
troit*, and *Kaskaskia*. It accordingly directs the sale of
all the lands in those districts except certain specified
parts thereof. This act, of itself, certainly, conferred no
rights upon the complainants at the time it was passed.
They were not then in existence, as a corporation, but
even if they had been, there is nothing to designate them
as the persons for whose use the land thus reserved from
sale was intended. The reservation of the township of
land now in controversy from sale, by this act, cannot
operate as a grant of it to any person, sole or corporate,
for the simple reason that no such person is named as
grantee.

It is contended by the counsel for the appellees, that
there are exceptions to the general rule that there can
be no grant unless there is a grantee *in being*, and several
cases are cited in support of this position. They are
cases of dedications of property to public uses, and we
have no disposition to question the correctness of the
doctrines held on that subject, but we think they are not
applicable, in considering the effect of this act.

The immediate effect of the act of 1804, was to cause
one township in each of the three land districts to be re-
served from sale, and it further points out a purpose for
which they were reserved, namely, they were intended to
be appropriated to the use of "a seminary of learning."
But what seminary of learning? None is specified.
There is nothing to indicate whether the three townships
in the three land districts were intended for the use of
one seminary, or one in each district; nor, indeed, is there
the slightest intimation given as to what seminary was

Nov. Term,
1850.

THE STATE
v.
THE TRUS-
TEES, &c.

intended. No doubt there existed then and since in the *United States* numerous seminaries of learning, any one of which might with equal reason have claimed to be *the* seminary for the use of which these townships of land were reserved. Common sense would seem sufficient to determine that a grant cannot be operative unless there is some means of ascertaining in whom the rights granted are intended to vest.

We think, therefore, the only reasonable construction which can be given to this act is, that congress intended by it, in authorizing the sale of a large quantity of public lands, to reserve certain portions, with the intention of thereafter appropriating those portions to the purposes specified; that is, in the cases of the township reserved in each land district, congress intended to appropriate them to the use of such seminary or seminaries of learning as it should afterwards name or designate.

If the words used could be construed to operate as a dedication of these lands to public uses, or to the public to be applied, by the public authorities, to the use of some one or more seminaries of learning, the result would be the same, so far as regards the questions we have now to consider, for, as there is nothing indicating an intention to give them exclusively to the people of the *Indiana* territory, or of the land districts in which they are situated, for that purpose, the dedication would be to the inhabitants of the union, and the power to make the application would still remain in congress. The sections numbered sixteen in each township are declared to be reserved *for the support of schools within the same*, but no one has ever supposed that this reservation of a section in each township, though accompanied by the express declaration that it was to be for the use of schools in the township in which it is situated, was intended to give the inhabitants of the townships, respectively, the exclusive right to appropriate the reserved sections to the support of such schools as they should think proper.

The next material step taken after the passage of the act of 1804, was the location of the township reserved in

the *Vincennes* district, by the secretary of the treasury. It is not contended that this officer had any power to designate the seminary for the use of which the land was reserved from sale, nor did he attempt to do so. His location, therefore, served merely to designate the particular township reserved from sale.

After the passage of the act of 1804, and the subsequent location, the title to the lands in controversy, and the power to appropriate them to the use of "a seminary of learning" remained in congress. This power could be exercised, no doubt, either directly by an act granting the use of the lands to a seminary of learning, or indirectly by lodging a power elsewhere to do so. But no rights were conferred upon the trustees of the *Vincennes University*, nor was any power given by this act to the territorial legislature to grant the use of these lands to them, and, therefore, unless that body derived a competent authority to do so from some other source, its act of *November*, 1806, so far as respects such a grant, must be considered altogether nugatory.

It is not pretended that the territorial legislature had any power to grant the use of these lands to the complainants, except such as was derived from the act of congress just mentioned, and the general powers conferred upon it by the acts organizing the territorial government. The act of *May* 7th, 1800, which was then in force, gave to the *Indiana* territory, which comprised all the territory of the *United States* north-west of the *Ohio* river which was westward of a line beginning at the *Ohio* opposite the mouth of the *Kentucky* river, running thence to *Fort Recovery*, and thence north until it intersected the line between the *United States* and *Canada*, a territorial government in all respects similar to that provided by the ordinance of 1787. Authority was given to the legislature "to make laws in all cases for the good government of the district not repugnant to the principles and articles" in the ordinance established and declared. The third article of the ordinance declares that, "religion, morality, and knowledge, being necessary for good go-

Nov. Term,
1850.

THE STATE
v.
THE TRUS-
TEES, &c.

vernment and the happiness of mankind, schools and the means of education shall forever be encouraged." The fourth article, after making certain provisions relative to the territorial districts, and the new states thereafter to be formed within them, provides, "that the legislatures of these districts or new states shall never interfere with the primary disposal of the soil by the *United States*." Nothing further can be found in the ordinance, or in the subsequent acts of congress establishing the territorial government, which has the least appearance of conferring a power on the territorial legislature, to grant the use of the lands in controversy to the complainants, and we think it can scarcely be seriously contended that such power was given by these provisions.

We are, certainly, strengthened in our opinion that the conclusions we have come to, as to the effect of the act of 1804, are correct, by the fact that they coincide with what appears to have been the constant understanding both of congress and the state legislature.

In *March*, 1805, an act was passed by congress, supplementary to the act of 1804, providing for the survey of certain lands, not included in the provisions of the act first passed. The seventh section of this act is as follows:

" That all the sections heretofore reserved *for the future disposition of congress*, and lying within either of the districts established for the disposal of public lands, in the state of *Ohio*, with the exception of the sections numbered sixteen, of the salt springs and lands reserved for the use of the same, and of the other sections, or tracts of land, heretofore specifically appropriated, shall be offered for sale in that district, within which such reserved sections may lie, on the same terms, and under the same regulations, as other lands in the same districts"

It would seem from this act, that congress considered that the sections numbered sixteen, and the other reservations mentioned, were reserved for its future disposition, or it would have been unnecessary to except them from the general operation of the act.

So, in 1816, by compact with the state, congress grant-

Nov. Term, 1850.

THE STATE v. THE TRUSTEES, &c.

ed the sections numbered sixteen, to the inhabitants of the township in which they are situated, and vested the title of the salt lands, and of one township, in addition to the one before reserved, in the state, on certain specified conditions. This compact was, doubtless, made by congress, with the view of carrying out the original intentions with which these lands were reserved, but it does not the less show that further action on the part of congress was deemed necessary to effect a grant of the lands, for the purposes intended.

It is, indeed, contended by the counsel for the complainants, that it was not intended by the act of 1816, to vest the township originally reserved in the state, and that the words, " in addition to the one heretofore reserved for that purpose," are merely explanatory. We think the fourth clause, especially when considered in connection with the other parts of the section, should be construed differently, but even such a construction would not enable the complainants to show any title in themselves.

The act of the state legislature, establishing a state seminary, was passed in 1820, and at the same session, a joint resolution was adopted, appointing a superintendent to to take possession of, and lease the lands in controversy. In 1822 and in 1827, acts were passed directing their sale, and they were accordingly sold by the state. A small portion appears to have been sold under the act of 1822, but the largest portion, indeed almost the whole, of the lands in question, were sold under the act of 1827. These acts, certainly, do not indicate that the legislatures of that period had any doubt of the right of the state to take possession of these lands and direct the application of the proceeds under the act of congress of 1816.

It is contended by the complainants, that the action of congress on their petition for authority to sell these lands, and the passage of the act confirming the titles of the purchasers of the 4000 acres sold, affords proof that congress recognised the validity of their claim under the grant of the territorial legislature. We think these acts have no important bearing on the case. The act confirm-

Nov. Term,
1850.

THE STATE
v.
THE TRUS-
TEES, &c.

ing the title of the purchasers, serves rather to show that their title under the sale to them by the complainants was not considered valid.

The complainants also insist, that as no steps were taken by the state to dispose of the township in *Gibson* county until 1820, though some acts relative to the township in *Monroe* county, had been previously passed, the inference should be drawn, that the legislatures of the state did not, prior to the year 1820, understand the act of congress of 1816 as vesting the right to the township in *Gibson* county in the state. They say that the usurpation of the state, is founded on a false recital in the seventh section of the act of *January* 22d, 1822, namely, that " the said board had expired by the negligence of its members." But that recital refers only to sales said to have been previously made by the board without executing deeds to the purchasers, and the whole purpose of the section was to provide that deeds should be made to claimants, under such sales, when, upon the evidence adduced, the commissioners should deem it just and right that such deed should be made. The state had provided for taking possession of the land, two years before, by the joint resolution appointing *Emmerson*, superintendent.

We do not think any inference unfavorable to the right of the state, can be justly drawn from these facts, while, on the other hand, though it must have been notorious that the state did, under the several acts mentioned, commencing in 1820, take possession of, and sell the land, no hostile claim appears to have been set up by the complainants from that period until actions of ejectment were commenced, against the occupants holding under the state, in 1844. Their silence for a period of nearly twenty-four years, under what they now term a wrongful usurpation by the state, when so large an amount of property was involved, affords, certainly, some reason to suppose that they had not any very great confidence in the validity of their claim. The counsel for the state has, indeed, endeavored to take advantage of this inaction of the complainants by pleading the statute of limitations,

as a bar to the suit, but we have not deemed it necessary to inquire into the sufficiency of that plea, as we have arrived at the conclusion that the suit is not sustainable, for the reason that it is not shown that the complainants ever had any valid title to the possession of the lands claimed by them.

Nov. Term, 1850.

The decree of the Circuit Court must, therefore, be reversed, and, in accordance with the usual practice in chancery cases, the cause will be remanded to that Court with directions to dismiss the bill.

*Per Curiam.*—The decree is reversed as above, with costs.

*O. H. Smith* and *G. G. Dunn*, for the state.

*S. Judah*, for the defendants.

